Citation Nr: 1722265 
Decision Date: 06/15/17 Archive Date: 06/29/17

DOCKET NO. 11-05 998 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Waco, Texas


THE ISSUES

1. Entitlement to an initial rating in excess of 10 percent for patella chondromalacia of the right knee prior to December 28, 2009. 

2. Entitlement to a rating in excess of 30 percent for patella chondromalacia of the right knee since December 28, 2009. 

3. Entitlement to an initial compensable rating for bilateral hearing loss. 

4. Entitlement to an initial rating in excess of 10 percent for tinnitus.

5. Entitlement to an extension of a temporary total rating following right knee surgery beyond November 1, 2003, under the provisions of 38 C.F.R. § 4.30.

6. Entitlement to a total rating based on individual unemployability due to service-connected disabilities (TDIU). 



REPRESENTATION

Appellant represented by: Virginia Girard-Brady, Attorney at Law


ATTORNEY FOR THE BOARD

J. Smith, Counsel


INTRODUCTION

The Veteran served on active duty from January 1985 to January 1989, and October 1989 to February 1994 in the United States Air Force.

This matter comes before the Board of Veterans' Appeals (Board) on appeal from January 2010 and July 2013 rating decisions of the Department of Veterans Affairs (VA) Regional Office (RO) in Waco, Texas.

In March 2014, the Board denied a rating in excess of 10 percent prior to December 28, 2009, and remanded the claim for a rating in excess of 30 percent since December 28, 2009, entitlement to a temporary total rating following right knee surgery, and a TDIU for further development. The Veteran appealed the Board's denial to the United States Court of Appeals for Veterans Claims (Court). 

In October 2014, the Court vacated the portion of the March 2014 Board decision denying a rating in excess of 10 percent prior to December 28, 2009, and remanded the matter to the Board for development consistent with the parties' Joint Motion for Remand (Joint Motion).

In January 2015 and May 2015, the Board remanded the appeal for further development.

The Board recognizes that in November 2016, the Veteran filed a timely notice of disagreement (NOD) with an August 2016 rating decision. However, as November 2016 correspondence indicates the RO responded to the NOD and is actively processing it, remand of these claims for the issuance of a statement of the case (SOC) is unnecessary. See Manlincon v. West, 12 Vet. App. 238 (1999).

With regard to the claim for an extension of a temporary total rating following right knee surgery beyond November 1, 2003, the Board added this matter to the appeal in March 2014. At that time, and in subsequent remands, the claim was captioned as simply entitlement to a temporary total rating, as such a rating had not been awarded. In May 2016, the RO awarded a temporary total rating from August 20, 2003 through November 1, 2003. As this was not a full grant of the benefit sought on appeal, and the Veteran has not indicated that he agrees with the award, his claim remains on appeal. See AB v. Brown, 6 Vet. App. 35 (1993). In this vein, in the March 2014 remand, the Board specified that a temporary total rating should be considered for the time period through August 2004; as the temporary total rating was not extended this far, the claim has not been fully granted. See March 2014 Board Remand, p. 19. Finally, while the Veteran filed a timely NOD to the May 2016 rating decision, as the matter is already on appeal, remand for an SOC is not necessary.


FINDINGS OF FACT

1. Prior to December 28, 2009, extension of the right knee was not limited to 15 degrees or worse.

2. Since December 28, 2009, extension of the right knee has not been limited to 30 degrees or worse.

3. On VA audiological testing in July 2013, the Veteran's hearing acuity was Level II in the right ear and I in the left ear. On VA audiological testing in March 2016, it was Level II bilaterally.

4. The Veteran's service-connected tinnitus has been assigned a 10 percent rating for the entire appeal period, which is the maximum schedular rating authorized for tinnitus under 38 C.F.R. § 4.87, Diagnostic Code 6260.

5. The August 20, 2003, right knee surgery did not necessitate convalescence beyond November 1, 2003.

6. The Veteran's service-connected disabilities have not rendered him unable to secure or follow substantially gainful employment. 


CONCLUSIONS OF LAW

1. Prior to December 28, 2009, the criteria for an initial rating in excess of 10 percent for patella chondromalacia of the right knee were not met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 4.1, 4.3, 4.7, 4.10, 4.27, 4.40, 4.45, 4.59, 4.71a, Diagnostic Code 5261 (2016).

2. Since December 28, 2009, the criteria for a rating in excess of 30 percent for patella chondromalacia of the right knee have not been met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 4.1, 4.3, 4.7, 4.10, 4.27, 4.40, 4.45, 4.59, 4.71a, Diagnostic Code 5261 (2016).

3. The criteria for an initial compensable rating for bilateral hearing loss have not been met. 38 U.S.C.A. § 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 3.321, 4.1, 4.3, 4.7, 4.10, 4.85, 4.86, Diagnostic Code 6100 (2016).

4. The criteria for an initial rating in excess of 10 percent for tinnitus have not been met. 38 U.S.C.A. §§ 1155, 5107 (West 2015); 38 C.F.R. §§ 3.321, 4.87, Diagnostic Code 6260 (2016).

5. The criteria for entitlement to an extension of a total disability evaluation based on the need for convalescence for the Veteran's service-connected right knee surgery beyond November 1, 2003, have not been met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 4.30 (2016).

6. The criteria for entitlement to a TDIU have not been met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.340, 3.341, 4.15, 4.16 (2016).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Higher Ratings

Disability evaluations are determined by evaluating the extent to which a veteran's service-connected disability adversely affects his or her ability to function under the ordinary conditions of daily life, including employment, by comparing his or her symptomatology with the criteria set forth in the Schedule for Rating Disabilities. The percentage ratings represent, as far as can practicably be determined, the average impairment in earning capacity resulting from such diseases and injuries and the residual conditions in civilian occupations. Generally, the degree of disabilities specified are considered adequate to compensate for considerable loss of working time from exacerbation or illness proportionate to the severity of the several grades of disability. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.1. Separate diagnostic codes identify the various disabilities and the criteria for specific ratings. 

If two disability evaluations are potentially applicable, the higher evaluation will be assigned to the disability picture that more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7. Any reasonable doubt regarding the degree of disability will be resolved in favor of the Veteran. 38 C.F.R. § 4.3. However, the evaluation of the same disability under various diagnoses, known as pyramiding, is to be avoided. 38 C.F.R. § 4.14.

The Veteran's entire history is to be considered when making disability evaluations. See generally 38 C.F.R. § 4.1; Schafrath v. Derwinski, 1 Vet. App. 589 (1995). Separate ratings may be assigned for separate periods of time based on the facts found. In other words, the evaluations may be staged. Fenderson v. West, 12 Vet. App. 119 (1999); Hart v. Mansfield, 21 Vet. App. 505 (2007). Here, as described below, staged ratings are not warranted for the Veteran's disabilities. 

It is the Board's responsibility to evaluate the entire record on appeal. See 38 U.S.C.A. § 7104(a) (West 2014). Although the Board has an obligation to provide reasons and bases supporting this decision, there is no need to discuss each and every piece of evidence submitted by the appellant or on his behalf. See Gonzales v. West, 218 F.3d 1378, 1380-81 (Fed. Cir. 2000). Rather, the Board's analysis below will focus specifically on what evidence is needed to substantiate the claims and what the evidence in the claims file shows, or fails to show, with respect to the claims. See Timberlake v. Gober, 14 Vet. App. 122, 128-30 (2000). 

VA is responsible for determining whether the evidence supports the claim or is in relative equipoise, with the Veteran prevailing in either event, or whether a preponderance of the evidence is against the claim, in which case the claim is denied. 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102; Gilbert v. Derwinski, 1 Vet. App. 49 (1990).

As discussed below, the VA examination reports are adequate for adjudication. The examiners examined the Veteran, considered his history, and set forth objective findings necessary for adjudication. The Board has further considered the admissible and believable assertions of the Veteran. See, e.g., Layno v. Brown, 6 Vet. App. 465, 470 (1994). However, the lay statements are not considered more persuasive than the objective medical findings which, as indicated below, do not support higher ratings than those already assigned. 

In the Board's May 2015 remand, the claims for higher ratings for the right knee disability were characterized to include extraschedular consideration. In the Veteran's VA Form 9 for higher ratings for hearing loss and tinnitus, he requested extraschedular consideration of the claims. As the matter of entitlement to extraschedular consideration has been raised by the Veteran and his attorney in connection with the claims for higher ratings, the Board will address the matter. See Doucette v. Shulkin, No. 15-2818 (Vet. App. March 6, 2017).

If an exceptional case arises where ratings based on the statutory schedules are found to be inadequate, consideration of an extraschedular evaluation commensurate with the average earning capacity impairment due exclusively to the service-connected disability or disabilities will be made. 38 C.F.R. § 3.321(b)(1). 

With regard to the Veteran's right knee disability, the lay and medical evidence of record fails to show unique or unusual symptomatology that would render the schedular criteria inadequate. As discussed below, symptoms (pain, weakness, stiffness, swelling, fatigability, flare-ups, lack of endurance, decreased speed, instability, incoordination) are fully contemplated in the assigned schedular ratings. The application of the Rating Schedule is not rendered impractical. In other words, the Veteran does not have any symptoms resulting from his service-connected right knee disability that are unusual or different from those contemplated by the schedular criteria.

With regard to the Veteran's hearing loss, the evidence of record also fails to show unique or unusual symptomatology that would render the schedular criteria inadequate. As discussed below, in the course of the appeal, his symptoms have been comprised of difficulty hearing or understanding speech, including needing to ask others to repeat themselves, difficulty hearing in the presence of background noise or with more than one person speaking, difficulty locating sounds, difficulty hearing women's voices, needing to speak loudly to others, and difficulty hearing noises that pose a safety risk at work. These symptoms fall squarely within those contemplated by the rating schedule, as explained, in Doucette. The Veteran has not reported symptoms outside of this, such as ear pain (otalgia), dizziness, or recurrent loss of balance.

Hearing loss is addressed in 38 C.F.R. § 4.85, which provides for ratings from 0 percent to 100 percent, and includes provisions for special monthly compensation for deafness. Evaluations are based on the lack of usefulness of the Veteran's hearing, especially in self-support. See 38 C.F.R. § 4.10. In addition, the degrees of disability specified are considered adequate to compensate for considerable loss of working time from exacerbations or illnesses proportionate to the severity of the several grades of disability. 38 C.F.R. § 4.1. Factors such as interference with employment and impairment of daily activities, noted in the evidence cited above, are clearly contemplated in the schedule and provided for in the schedular evaluation assigned. Nonetheless, the schedular rating criteria specifically provide for ratings based on all levels of hearing loss, including exceptional hearing patterns, which are not demonstrated in this case, and as measured by both audiology testing and speech recognition testing. Missing words in conversation is an impairment that is specifically measured by speech recognition testing, which is designed to measure words not recognized or understood by the Veteran being tested. Audiometric testing measures specific frequency sounds, which is a measure of sounds the Veteran would not hear, including sounds emitted during speech in conversation. The Veteran's complaints involve diminished auditory acuity and diminished speech recognition. Diminished auditory acuity and speech recognition testing are the foundation of the schedular criteria. The testing is to be performed without the use of hearing aids. See 38 C.F.R. § 4.85 (a). The scores represent a rating made on the worst possible objective measure of performance. 

In short, the Veteran does not have any symptoms or functional impairment from the service-connected bilateral hearing loss that are unusual or is different from those measured by the schedular rating criteria. See Martinak v. Nicholson, 21 Vet. App. 447, 455 (2007) (in addition to providing objective test results, a VA audiometric examination report must address the functional effects caused by a hearing disability because an extraschedular rating under 38 C.F.R. § 3.321 (b) "does not rely exclusively on objective test results to determine whether a referral for an extraschedular rating is warranted."). Therefore, referral for consideration of an extraschedular rating is not warranted in this case.

With regard to the Veteran's tinnitus, the lay and medical evidence of record again fails to show unique or unusual symptomatology that would render the schedular criteria inadequate. Tinnitus is defined as a "noise in the ears, such as a ringing, buzzing, roaring, or clicking." Dorland's Illustrated Medical Dictionary 1930 (32nd ed. 2012). As discussed below, the Veteran's symptoms (sounds of whirring, high-pitched hissing, and high-pitched whistling) are fully contemplated in the assigned schedular rating, which contemplates tinnitus of any severity. The application of the Rating Schedule is not rendered impractical. In other words, the Veteran does not have any symptoms resulting from his service-connected tinnitus that are unusual or different from those contemplated by the schedular criteria.

Limiting referrals for extraschedular evaluation to considering a Veteran's disabilities individually can ignore the compounding negative effects that each individual disability may have on the Veteran's other disabilities. 38 C.F.R. § 3.321(b)(1) performs a gap-filling function, accounting for situations in which a Veteran's overall disability picture establishes something less than total unemployability, but where the collective impact of a Veteran's disabilities are nonetheless inadequately represented. Johnson v. McDonald, 762 F.3d 1362 (Fed. Cir. 2014). Therefore, referral for extraschedular consider may also be made to consider the compound/combined impact of multiple service-connected disabilities in determining whether referral for extraschedular consideration is needed. Id. The Veteran's attorney has requested the Board to address Johnson.

The Veteran is service-connected for posttraumatic stress disorder (PTSD) (50 percent disabling), the right knee disability (30 percent disabling), lumbosacral strain (20 percent disabling), right knee scars (20 percent disabling), tinnitus (10 percent disabling), left knee strain (10 percent disabling), residuals of a fracture of the left middle finger (noncompensable), hearing loss (noncompensable), and non-limiting right knee scars (noncompensable). However, there is simply no indication in the record that the overall severity of these disabilities combined falls outside the realm of the schedular criteria. This is not an exceptional circumstance in which extraschedular consideration is required to compensate the Veteran for a disability that can be attributed only to the combined effect of multiple conditions.

 Right Knee

In the January 2010 rating decision on appeal, the RO awarded service connection for patella chondromalacia of the right knee and assigned a 10 percent rating, effective from May 12, 2003 under 38 C.F.R. § 4.71a, Diagnostic Code 5257-5261. The RO additionally awarded a 30 percent rating, effective from December 28, 2009. 

In March 2014, the Board denied a rating higher than 10 percent for the right knee disability prior to December 28, 2009. The matter of a rating higher than 30 percent since December 28, 2009 was remanded for further development.

In October 2014, the Court vacated the Board's denial of a rating higher than 10 percent prior to December 28, 2009. The Court determined that the Board erred in relying on a September 2009 VA examination report, which was inadequate as the examiner did not identify at what point during range of motion testing the Veteran experienced limited motion attributable to pain.

In January 2015 and May 2015, the Board remanded the appeal for further development. 

In May 2016, the RO awarded a temporary total evaluation for the right knee disability, effective from August 20, 2003 to November 1, 2003, based on surgical treatment requiring convalescence. Evidence dated from August 20, 2003 to November 1, 2003 will not be addressed as the Veteran was already receiving the maximum schedular evaluation possible during that time period. Further, the matter of an extension of this temporary total rating is discussed below. 

In August 2016, the RO awarded service connection for postoperative right knee scars, and assigned a 20 percent rating effective September 28, 2015. The RO also awarded service connection for non-limiting residual postoperative right knee scars, and assigned a noncompensable rating effective September 28, 2015. As noted in the Introduction section above, the RO is currently processing the Veteran's NOD filed in response to the August 2016 rating decision. The matters of the Veteran's scars are not currently in appellate status and will not be addressed here.
 
Disability of the musculoskeletal system is primarily the inability, due to damage or infection in the parts of the system, to perform the normal working movements of the body with normal excursion, strength, speed, coordination, and endurance. It is essential that the examination on which ratings are based adequately portray the anatomical damage and the functional loss with respect to all of these elements. 

The functional loss may be due to absence of part, or all, of the necessary bones, joints and muscles, or associated innervation, or other pathology and evidenced by visible behavior of the claimant undertaking the motion. Weakness is as important as limitation of motion, and a part that becomes painful on use must be regarded as seriously disabled. 38 C.F.R. § 4.40. 

Pain on movement, swelling, deformity or atrophy of disuse as well as instability of station, disturbance of locomotion, interference with sitting, standing and weight bearing are relevant considerations for determination of joint disabilities. 38 C.F.R. § 4.45. Painful, unstable, or malaligned joints, due to healed injury, are entitled to at least the minimal compensable rating for the joint. 38 C.F.R. § 4.59. The United States Court of Appeals for Veterans Claims (Court) has, however, held that pain alone does not constitute functional loss under VA regulations that evaluate disabilities based upon loss of motion. Mitchell v. Shinseki, 25 Vet. App. 32 (2011).

VA's rating schedule provides for ratings of 10, 20, or 30 percent where there is limitation of flexion of the leg to 45, 30, or 15 degrees, respectively. 38 C.F.R. § 4.71a, Diagnostic Code 5260.

The rating schedule also provides ratings of 10, 20, 30, 40, and 50 percent for limitation of extension of the leg to 10, 15, 20, 30, and 45 degrees, respectively. 38 C.F.R. § 4.71a, Diagnostic Code 5261.

For rating purposes, a normal range of motion in a knee joint is from 0 to 140 degrees. 38 C.F.R. § 4.71, Plate II.

VA's General Counsel has held that a claimant who has arthritis (resulting in limited or painful motion) and instability of a knee may be rated separately under Diagnostic Codes 5003 and 5257, cautioning that any such separate rating must be based on additional disabling symptomatology. See VAOPGCPREC 23-97, 62 Fed. Reg. 63,604 (1997); VAOPGCPREC 9-98, 63 Fed. Reg. 56,704 (1998). The VA General Counsel has further held that separate ratings under 38 C.F.R. § 4.71a, Diagnostic Code 5260 (limitation of flexion of the leg) and Diagnostic Code 5261 (limitation of extension of the leg) may be assigned for disability of the same joint. See VAOPGCPREC 9-2004; 69 Fed. Reg. 59,990 (2004).

Under Diagnostic Code 5257, slight recurrent subluxation or lateral instability, is rated as 10 percent disabling. Moderate recurrent subluxation or lateral instability warrants a 20 percent rating, and severe recurrent subluxation or lateral instability warrants a 30 percent rating. 38 C.F.R. § 4.71a, Diagnostic Code 5257.

When evaluating musculoskeletal disabilities, VA may, in addition to applying schedular criteria, consider granting a higher rating in cases in which the claimant experiences additional functional loss due to pain, weakness, excess fatigability, or incoordination, to include with repeated use or during flare-ups, and those factors are not contemplated in the relevant rating criteria. See 38 C.F.R. §§ 4.40, 4.45; DeLuca v. Brown, 8 Vet. App. 202, 204-7 (1995). The provisions of 38 C.F.R. §§ 4.40 and 4.45 are to be considered in conjunction with the diagnostic codes 
predicated on limitation of motion. See Johnson v. Brown, 9 Vet. App. 7 (1996).

On VA examination in June 2004, the Veteran reported pain ranging from 5/10-7/10 in the right knee. There was mild weakness and stiffness. He reported intermittent swelling, but denied heat or redness. He reported no locking of the knee, but that he had fatigability and a lack of endurance. He denied flare-ups. He did not use assistive devices or corrective shoes. He reported that due to his knee, he had to give up letter carrying and train for an administrative position. At home, he reported needing help to get up from a position on the floor, and that he could no longer run for exercise.
 
On examination, there was no crepitus. There was mild effusion. The knee could extend to 0 degrees and flex to 80 degrees. On repetition, flexion was to 62 degrees. There was pain on repetition. 

On VA examination in September 2009, the Veteran reported deformity, giving way, instability, pain, stiffness, weakness, incoordination, and decreased speed. He denied dislocation or subluxation, locking, and effusion. He reported warmth, swelling, and tenderness. He reported weekly flare-ups lasting 1-2 days. Work was a precipitating event and medication and ice relieved symptoms. He did not have limitations on standing or walking. He required a brace frequently and occasionally used shoe inserts.

On examination, an antalgic gait was noted. There was evidence of abnormal weight bearing. There was no grinding, clicks, or snaps. There was no instability, patellar abnormality, or meniscus abnormality. The Veteran's range of motion was 0 to 130 degrees. There was no objective evidence of pain or other limitations on repetition. There was no ankylosis. The right knee disability caused increased absenteeism at work. It prevented sports, had a moderate effect on recreation and sleeping, had a mild effect on chores, shopping, exercise, and traveling, and had no effect on feeding, bathing, dressing, toileting, grooming, and driving.

On VA examination in December 2009, the Veteran reported no deformity or instability. He had giving way, pain, stiffness, weakness, and decreased speed. He did not have dislocation or subluxation. He reported locking one to three times monthly. He had no effusion, but had tenderness. He reported weekly flare-ups lasting 1-2 days. Precipitating factors included using stairs, prolonged walking, sitting, and standing. His symptoms were somewhat helped by rest, medication, and a knee brace. He could stand for up to one hour and walk for one to three miles. 

On examination, the Veteran had an antalgic gait. There was evidence of abnormal weight-bearing. There was tenderness, pain at rest, weakness, abnormal motion, and guarding of movement. There was mild crepitation, no grinding, no instability, no patellar abnormality, and no meniscus abnormality. Right knee flexion was 0 to 125 degrees, and extension was limited by 15 degrees. There was pain on repetition. After repetitive motion, flexion was 0 to 120 degrees, and extension was 120 to -20 degrees. There was no joint ankylosis. The right knee disability caused decreased mobility and problems with lifting, carrying, and reaching at work. It caused increased absenteeism. The right knee disability prevented exercise, sports, and recreation, had a severe effect on chores, shopping, traveling, dressing, toileting, grooming, and driving, and had a moderate effect on bathing.

On VA examination in September 2015, the Veteran reported usual 7/10 pain of a sharp and burning nature in the right knee. He reported daily flare-ups of knee pain to 9/10, also sharp and burning in nature. The pain caused an instability in his gait, which was putting extreme pressure on the left knee and lower spine. He reported difficulty with prolonged walking, standing, driving, climbing, bending, kneeling, and stooping.

On examination, the Veteran's range of motion could not be tested due to pain. There was pain with weight bearing. There was objective evidence of localized tenderness or pain on palpation of the joint or associated soft tissue. There was crepitus. Repetitive testing could not be performed and findings regarding pain, weakness, fatigability, or incoordination on repeated use could not be made. There was weakened movement, disturbance of locomotion, and interference with standing. Muscle strength was reduced in the right knee. There was no joint ankylosis. There was no history of recurrent subluxation, lateral instability, or effusion. Joint stability testing was conducted and there was no joint instability. The Veteran did not have recurrent patellar dislocation, shin splints, stress fractures, or other tibial or fibular impairment. He had a meniscus condition manifested by frequent episodes of joint pain. He did not require assistive devices. In response to the Board's May 2015 remand inquiries, the examiner stated he had thoroughly reviewed the September 2009 VA examination report and could not determine at what point the Veteran had pain in the right knee in range of motion testing.

Considering the pertinent evidence in light of the above rating criteria, the Board finds that the preponderance of the evidence is against the assignment of a rating in excess of 10 percent for the Veteran's right knee disability prior to December 28, 2009, or in excess of 30 percent since that date. The Veteran's right knee disability has been rated under DC 5261 based on limitation of extension. Prior to December 28, 2009, extension was to 0 degrees, corresponding to a noncompensable rating. After that date, at worst, extension was limited to 20 degrees on VA examination on December 28, 2009, corresponding to a 30 percent rating.

With regard to the DeLuca factors, the Board acknowledges the evidence documented throughout the entire appeal period of pain on motion and the Veteran's functional limitations. There is pain, weakness, and a lack of endurance that would significantly limit functional ability with repeated use over time, as well as during a flare-up. Despite this, the June 2004 examiner found only a decrease in flexion on repetition, and the December 2009 examiner found a small decrease overall in the range of motion on repetition. The Board finds insufficient medical evidence at any point during the appeal period to support that the Veteran's pain was so disabling as to actually or effectively limit knee motion to such an extent as to warrant the assignment of a higher rating under 38 C.F.R. § 4.71a, Diagnostic Code 5261. 

No other diagnostic code provides a basis for the assignment of higher or separate ratings. Taking the remaining diagnostic codes in chronological order, as ankylosis has not been shown at any point, a rating under DC 5256 is not warranted. The Veteran has intermittently reported instability, but as no VA examiner found evidence of recurrent subluxation or lateral instability, a separate rating under DC 5257 is not warranted. The Board has considered the possibility of separate ratings under DC 5258 or DC 5259 as the evidence indicates dislocated, semilunar cartilage with locking pain and effusion, and the symptomatic removal of semilunar cartilage, respectively. However, the evaluation of the same disability under various diagnoses, known as pyramiding, is to be avoided. 38 C.F.R. § 4.14. To determine what constitutes the same disability or manifestation for purposes of pyramiding, the Board looks to the symptomatology of the conditions; if the symptomatology of one condition is duplicative of or overlapping with the other condition, awarding separate ratings would constitute pyramiding. Here, as the Veteran's primary manifestation relating to his meniscus conditions is pain, effusion, and limited motion, the Board finds this symptomatology overlaps with that contemplated by his already service-connected disability. A separate rating under DC 5260 based on limitation of flexion is not warranted as flexion has not been limited to 60 degrees or less at any point in the appeal period. As the record does not indicate an impairment of the tibia or fibula or genu recurvatum, DCs 5262 and 5263 are not applicable.

The Board has also considered Correia v. McDonald, 28 Vet. App. 158 (2016), which holds that the final sentence of 38 C.F.R. § 4.59 requires that VA examinations include joint testing for pain on both active and passive motion, in weight-bearing and nonweight-bearing and, if possible, with range of motion measurements of the opposite undamaged joint. 

The Board finds that the VA examination reports of record contain sufficient findings under Correia. Range of motion measurements for the left knee are unnecessary as the left knee is not "undamaged." To the extent the VA examination reports do not contain specific and separate findings in weight bearing and non-weight bearing status, pain in weight-bearing has been considered by each examiner because every examination report contains findings and observations concerning the Veteran's gait, including difficulties caused by pain or other factors. The record does not indicate that pain in weight-bearing status has caused any additional loss of motion, and since pain while bearing weight is presumably more severe than while not bearing weight, the same may be said for non-weight bearing status. To the extent the VA examination reports do not contain specific and separate findings in active and passive motion, each examination report indicates that the Veteran moved his knee on his own free will, indicating that pain in active motion has been considered. It follows that an assessment of passive motion would yield the same result; if the Veteran was able to move his knee himself to a particular degree, the knee would be capable of the same movement by the examiner. 

For all the foregoing reasons, the Board finds that the preponderance of the evidence is against higher ratings for the Veteran's right knee disability. The preponderance of the evidence is also against the assignment of separate ratings for the right knee disability. In reaching these decisions the Board considered the doctrine of reasonable doubt, however, to the extent the preponderance of the evidence is against ratings higher than those just described, the doctrine is not for application. 

 Hearing Loss

Under the applicable criteria, disability ratings are determined by a mechanical application of the rating schedule to the numeric designations assigned after audiometric evaluations are performed. See Lendenmann v. Principi, 3 Vet. App. 345, 349 (1992). Hearing loss disability evaluations range from 0 percent to 100 percent based on organic impairment of hearing acuity, as measured by controlled speech discrimination tests in conjunction with the average hearing threshold, as measured by puretone audiometric tests in the frequencies 1000, 2000, 3000 and 4000 Hertz.

The rating schedule establishes 11 auditory acuity levels designated from Level I for essentially normal hearing acuity, through Level XI for profound deafness. VA audiometric examinations are conducted using a controlled speech discrimination test together with the results of a puretone audiometry test. 

The vertical lines in Table VI represent nine categories of the percentage of discrimination based on the controlled speech discrimination test. See 38 C.F.R. 
§ 4.85. The horizontal columns in Table VI represent nine categories of decibel loss based on the pure tone audiometry test. The numeric designation of impaired hearing (Levels I through XI) is determined for each ear by intersecting the vertical row appropriate for the percentage of discrimination and the horizontal column appropriate to the puretone decibel loss. The percentage evaluation is found from Table VII by intersecting the vertical column appropriate for the numeric designation for the ear having the better hearing acuity and the horizontal row appropriate to the numeric designation level for the ear having the poorer hearing acuity. 38 C.F.R. § 4.85.

Exceptional patterns of hearing impairment are addressed in 38 C.F.R. § 4.86, although this regulation is not applicable here. 

On VA examination in July 2013, the Veteran reported that his hearing loss impacted his ability to hear customers at work. He stated it was hard to talk with people or communicate. He had no history of ear disease, including infections, surgery, perforation, or dizziness. His ear canals were free of cerumen, and the tympanic membranes were normal. The following pure tone thresholds, in decibels, were obtained:
 


HERTZ




1000
2000
3000
4000
RIGHT
35
45
70
80
LEFT
30
45
70
70

The pure tone threshold average was 57.5 decibels (dB) in the right ear and 53.75 dB in the left ear. Speech discrimination scores were 100 percent bilaterally. Applying the method for evaluating hearing loss to the results of the Veteran's audiological evaluation reveals Level II hearing in the right ear and Level I hearing in the left ear. Combining these according to Table VII reveals a noncompensable rating. 38 C.F.R. § 4.85, Diagnostic Code 6100.

On VA examination in March 2016, the Veteran reported that his hearing loss impacted his ability to hear his grandchildren and his customers. He had trouble hearing dogs as a mail carrier, which caused some safety concerns. He stated he sometimes had a hard time hearing questions while teaching safety classes, and had a hard time hearing his wife. He had no history of ear infections, surgery, perforation, or dizziness. His ear canals were free of cerumen, and tympanic membranes were unremarkable. The following pure tone thresholds, in decibels, were obtained:
 

HERTZ




1000
2000
3000
4000
RIGHT
40
55
75
80
LEFT
40
55
75
75

The pure tone threshold average was 62.5 decibels (dB) in the right ear and 61.25 dB in the left ear. The initial speech recognition score was 92 percent bilaterally. Applying the method for evaluating hearing loss to the results of the Veteran's audiological evaluation reveals Level II hearing bilaterally. Combining these according to Table VII reveals a noncompensable rating. 38 C.F.R. § 4.85, Diagnostic Code 6100.

The preponderance of the evidence is against the assignment of a compensable schedular evaluation for the Veteran's bilateral hearing loss disability at any time during the appeal period, based on the audiometric data of record. The Board finds that no higher evaluation can be assigned pursuant to any other Diagnostic Code. Because there are specific Diagnostic Codes to evaluate hearing loss, consideration of other codes for evaluating the disability is not appropriate. 

While the Board has considered the applicability of the benefit of the doubt doctrine, as the preponderance of the evidence is against the Veteran's claim, entitlement to a compensable rating must be denied. 38 U.S.C.A. § 5107(b) (West 2014); Gilbert v. Derwinski, 1 Vet. App. 49 (1990).

 Tinnitus

The Veteran seeks entitlement to an initial rating in excess of 10 percent for tinnitus. On VA examination in July 2013, the Veteran reported noises resembling whirring and high-pitched hissing constantly, of gradual progression. On VA examination in March 2016, the Veteran reported a high-pitched whistling sounds constantly, of gradual progression. No other symptoms were reported.

Pursuant to the rating schedule, a 10 percent evaluation is assigned for recurrent tinnitus. 38 C.F.R. § 4.87, Diagnostic 6260. Only a single evaluation may be assigned, whether the sound is perceived in one ear, both ears, or in the head. Id. at Note (2); see Smith v. Nicholson, 451 F.3d. 1344 (2006).
 
Accordingly, the Veteran's tinnitus is currently assigned the maximum schedular rating. There is no legal basis upon which to award a higher schedular evaluation. See Sabonis v. Brown, 6 Vet. App. 426, 430 (1994). 
 
Extension of Temporary Total Rating

A total rating will be granted following hospital discharge, effective from the date of hospital admission or outpatient treatment and continuing for a period of 1, 2, or 3 months from the first day of the month following such hospital discharge or outpatient release, if the hospital treatment of the service-connected disability resulted in: (1) surgery necessitating at least one month of convalescence; (2) surgery with severe postoperative residuals such as incompletely healed surgical wounds, stumps or recent amputations, therapeutic immobilization of one major joint or more, application of a body cast, or the necessity for house confinement, or the necessity for continued use of a wheelchair or crutches (regular weight bearing prohibited); or (3) immobilization by cast, without surgery, of one major joint or more. Following the temporary total disability rating, the disability will be rated by the appropriate schedular evaluation. 38 C.F.R. § 4.30 (2016).

A total rating may be extended as follows: (1) extensions of 1, 2, or 3 months may be made beyond the initial 3 months under all three provisions identified above; and (2) extensions of 1 or more months up to 6 months beyond the initial 6-month period may be made under only the "surgery with severe postoperative residuals" and "immobilization by cast" provisions. See 38 C.F.R. § 4.30 (b). 

The Court has held that convalescence is "the stage of recovery following an attack of disease, a surgical operation, or an injury," and recovery is "the act of regaining or returning toward a normal or healthy state." See Felden v. West, 11 Vet. App. 427, 430 (1998). The Felden Court additionally held that a veteran's incapacity to work after surgery must be taken into account in the evaluation of a claim brought under 38 C.F.R. § 4.30.

On August 20, 2003, the Veteran underwent arthroscopy of the right knee with arthroscopic lateral retinacular release, removal of chondral loose bodies, and thermal chondroplasty of the patella with microfracture drilling of the patella. In a May 2016 rating decision, he was assigned a temporary total rating under 38 C.F.R. § 4.30 from August 20, 2003 to November 1, 2003. A 30 percent disability rating was assigned from November 1, 2003 onward.

Private medical records (PMRs) from the August 20, 2003 surgery show the surgery was performed without complications. The postoperative plan included weightbearing as tolerated, and a follow-up appointment six days following the procedure.

An August 25, 2003 PMR showed the Veteran was doing fine. His gait was almost already normal. His wounds were clean and the sutures were removed. The Veteran was placed on a range of motion strengthening program. The surgeon noted he could possibly return to work in three weeks.

On September 18, 2003, the Veteran reported his knee was doing better. He had experienced a setback with therapy while doing lunges and step-ups, which caused patellofemoral pain. On examination, he had a small amount of effusion but a good range of motion. The surgeon altered the exercise prescribed, recommending shallow knee bends and stationary bicycling. A work release was prepared for September 29, 2003.

On November 10, 2003, the Veteran was doing fairly well. He had a good range of motion in the knee, which he reported was better than before the surgery. He was back to work as a mail carrier and felt about 80 percent. He reported he felt he could get better as long as the muscles continued to improve, and the surgeon agreed. He had a good home program. He was to be seen again on an as-needed basis.

In a September 2015 VA examination report, a VA examiner attempted to respond to the Board's remand inquiries about the Veteran's postoperative residuals. In doing so, the examiner noted that in August 2013, the Veteran was diagnosed with distal femoral osteochondroma, quadriceps tendinosis, instability of gait, pain with evidence of degenerative disease of the thoracolumbar spine, and increased stress and pain in the opposite knee.

In a February 2016 addendum, the examiner clarified his earlier findings. He stated that the August 2003 surgery did not result in an incompletely healed wound, therapeutic immobilization of one or more major joints, application of a body cast, necessity of house confinement, or necessity of continual use of a wheelchair or crutches.

The Board finds the preponderance of the evidence is against an extension of the temporary total rating. Initially, 38 C.F.R. § 4.30(a)(2) does not apply as the record does not indicate severe postoperative residuals such as incompletely healed surgical wounds, stumps or recent amputations, therapeutic immobilization of one major joint or more, application of a body cast, the necessity for house confinement, or the necessity for continued use of a wheelchair or crutches. To the contrary, postoperative surgical records and the February 2016 VA examination report show the Veteran's wound healed normally, there was no amputation or therapeutic immobilization, he was not confined to the house, and he did not require crutches or a wheelchair. Additionally, 38 C.F.R. § 4.30(a)(3) does not apply as a cast was not involved. Thus, 38 C.F.R. § 4.30 (a)(1) is the only applicable provision for addressing whether an extension is warranted.

The preponderance of the evidence does not indicate that the August 20, 2003 surgery necessitated convalescence beyond November 1, 2003. Effectively, it was shown that the Veteran returned toward a normal or healthy state at that time. He was working full-time as a mail carrier and had no significant complaints at his postoperative follow-up appointments. None of the Veteran's treating providers indicated that he required further convalescence following the surgery. 

The only other evidence to the contrary is the admissible and believable lay evidence. However, the VA examiner was a medical professionals who reviewed the claims file and considered the reported history, including the Veteran's own lay assertions. The examiners used their expertise in reviewing the facts of this case and did not determine that the Veteran's surgery resulted in severe postoperative residuals. As the examiner reached his conclusions based on an accurate characterization of the evidence, including the Veteran's lay statements and those of his family, the opinions are entitled to substantial probative weight. See Nieves-Rodriguez, 22 Vet. App. at 304 (2008). In weighing the VA examiner's opinions against those of the Veteran, the Board finds that the credibility and probative value of the specific and reasoned statement of the trained medical professional outweighs that of the general lay assertions.

While the Veteran experienced some knee symptoms following November 1, 2003, the disability rating assigned after the temporary total evaluation period is intended to cover the disabling nature of the disability. To equate any and all symptomatology related to the knee to convalescence is to render the nature of the temporary total rating provisions meaningless. The Veteran's post-surgical right knee symptoms are addressed by the disability ratings assigned since November 1, 2003. The medical records following the surgery support an appropriate convalescence period and a temporary total rating from August 20, 2003 to November 1, 2003. Accordingly, an extension of a temporary total convalescent rating beyond November 1, 2003, under 38 C.F.R. § 4.30 is not warranted.

TDIU

VA will grant a TDIU when the evidence shows that the Veteran is precluded, by reason of his service connected disabilities, from obtaining or maintaining "substantially gainful employment" consistent with his education and occupational experience. 38 C.F.R. §§ 3.340, 3.341, 4.16; VAOPGCPREC 75-91; 57 Fed. Reg. 2317 (1992). 

A threshold requirement for eligibility for a TDIU under 38 C.F.R. § 4.16(a) is that if there is only one such disability, it must be rated at 60 percent or more; if there are two or more disabilities, at least one disability must be rated at 40 percent or more, and sufficient additional disability must bring the combined rating to 70 percent or more. 

The Veteran is service-connected for posttraumatic stress disorder (PTSD) (50 percent disabling), the right knee disability (30 percent disabling), lumbosacral strain (20 percent disabling), right knee scars (20 percent disabling), tinnitus (10 percent disabling), left knee strain (10 percent disabling), residuals of a fracture of the left middle finger (noncompensable), hearing loss (noncompensable), and non-limiting right knee scars (noncompensable). 

His combined rating has been 70 percent since December 28, 2009 with one disability rated higher than 40 percent. The combined schedular rating criteria for consideration of TDIU under 38 C.F.R. § 4.16(a) have been met from this date. Prior to December 28, 2009, the Veteran's combined rating was less than 70 percent. Even considering the exceptions set forth in 38 C.F.R. § 4.16, the combined schedular rating criteria for consideration of TDIU under 38 C.F.R. § 4.16(a) were not met prior to December 28, 2009.

Regardless, it is VA's policy that all Veterans who are unable to secure a substantially gainful occupation by reason of service- connected disabilities "shall be rated totally disabled." See 38 C.F.R. § 4.16(b). Significantly, the Court has held that the Board has no power to award a TDIU under 38 C.F.R. § 4.16(b) in the first instance without ensuring that the claim is referred to VA's Director, Compensation Service for consideration of an extraschedular rating under 38 C.F.R. § 4.16(b). Bowling v. Principi, 15 Vet. App. 1, 10 (2001). While the Board cannot award a TDIU on an extraschedular basis in the first instance in the absence of a referral to VA's Director, Compensation Service, and there was no such referral here, the Board will consider whether a remand for such referral is warranted. In Bagwell v. Brown, 9 Vet. App. 337 (1996), the Court held that the Board's denial of referring an extra-schedular rating in the first instance does not violate the prejudice safeguard set forth in Bernard v. Brown, 4 Vet. App. 384 (1993) (holding that the Board must consider and discuss whether the veteran would be prejudiced by its action in adjudicating merits of a claim when the merits had not been reached by the agency of original jurisdiction). 

Consequently, the Board must determine whether the Veteran's service-connected disabilities have precluded him from engaging in substantially gainful employment (work that is more than marginal, which permits the individual to earn a "living wage.") Moore v. Derwinski, 1 Vet. App. 356 (1991). 

Significantly, the record shows the Veteran has been employed full-time throughout the entire period with the United States Postal Service (USPS) and there is no indication to the contrary.

On VA examination for the right knee in June 2004, the Veteran was working in an administrative position at the USPS, having transitioned from letter carrying.

On VA examination for the left middle finger in July 2007, the Veteran reported he had been working full-time for the USPS for 5 to 10 years. He reported missing less than one week of work due to his finger in the last year. The examiner found the knee disability caused increased absenteeism.

In a January 2009 psychiatric VA treatment record, the Veteran reported that he continued to work full-time at the USPS.

On VA examination for the right knee in September 2009, the Veteran reported he had been working full-time for the USPS for 10-20 years. He reported missing approximately one week of work in the last year due to his knee. The examiner found the knee disability caused increased absenteeism.

On VA examination for the right knee in December 2009, the Veteran reported he had been working full-time for the USPS for 10-20 years.

On VA audiological examination in September 2015, the examiner stated that the functional impact of the disability, including on occupational tasks, included difficulty hearing and communicating with customers. As for tinnitus, there was no impact on employment.

In a January 2015 VA treatment record, the Veteran reported that he worked full-time as a postal worker and walked a lot.

In a September 2015 VA psychiatric treatment record, the Veteran reported living with his wife and working full-time with the USPS.

On VA examination in September 2015 for the right knee and its scars, the examiner stated that the functional impact of the disability, including on occupational tasks, included daily difficulty with prolonged walking, standing, driving, climbing, bending, kneeling, and stooping.

On VA examination in September 2015 for the spine, the examiner stated that the functional impact of the disability, including on occupational tasks, included flare-ups causing difficulty with prolonged standing, walking, bending, stooping, and lifting over 20 pounds.

In an April 2016 VA psychiatric treatment record, the Veteran reported continuing to work, and that he often returned home from work irritable from his day.

The preponderance of the evidence is against the assignment of a TDIU at any point in the appeal period. Crucially, the Veteran has maintained a substantially gainful occupation throughout the appeal period, despite his service-connected disabilities. Moreover, while VA examiners have found an impact of the disabilities on work, no VA examiner has opined that he is unable to secure or follow substantially gainful employment. The preponderance of this evidence does not support a finding of an inability to secure or follow substantially gainful employment due to service-connected disabilities.

The only other evidence to the contrary of the VA examination reports is the admissible and believable lay evidence. However, the VA examiners were medical professionals who reviewed the claims file and considered the reported history, including the Veteran's own lay assertions. The examiners used their expertise in reviewing the facts of this case and did not determine that the Veteran's service-connected disabilities render him unable to secure or follow a substantially gainful occupation. As the examiners reached their conclusions based on an accurate characterization of the evidence, including the Veteran's lay statements and those of his family, the opinions are entitled to substantial probative weight. See Nieves-Rodriguez, 22 Vet. App. at 304 (2008). In weighing the VA examiner's opinions against those of the Veteran, the Board finds that the credibility and probative value of the specific and reasoned statement of the trained medical professional outweighs that of the general lay assertions.

The above evidence reflects that the weight of the evidence is against a TDIU as it indicates that the Veteran's service-connected disabilities do not produce unemployability. The benefit-of-the-doubt doctrine is therefore not for application, and the claim must be denied. 

Notice and Assistance

The Veterans Claims Assistance Act of 2000 (VCAA) describes VA's duty to notify and assist claimants in substantiating a claim for VA benefits. VA has satisfied its duties under the VCAA to notify and assist. Because service connection for the right knee disability, hearing loss, and tinnitus has been granted, and initial ratings and effective dates have been assigned, the notice requirements of 38 U.S.C.A. § 5103(a), have been met. Hartman v. Nicholson, 483 F. 3d 1311 (Fed Cir. 2007). The issue of TDIU entitlement is an inherent component of the rating claim for the right knee disability. Rice v. Shinseki, 22 Vet. App. 447 (2009). Where a claim has been substantiated after the enactment of the VCAA, the appellant bears the burden of demonstrating any prejudice from defective VCAA notice with respect to the downstream elements. There has been no allegation of such error in this case as to either the TDIU claim or temporary total rating claim.
 
VA's duty to assist under the VCAA includes helping claimants to obtain service treatment records (STRs) and other pertinent records, including PMRs. The claims file contains the Veteran's STRs, VA medical records (VAMRs), and PMRs. The duty to obtain relevant records is therefore satisfied. 

VA's duty to assist also includes providing a medical examination and/or obtaining a medical opinion when necessary to make a decision on the claim, as defined by law. Appropriate VA medical inquiries have been accomplished and are factually informed, medically competent and responsive to the issues under consideration. To the extent the appeal was remanded previously due to insufficiencies in the September 2009 VA examination, the reports are otherwise adequate for adjudication.

The Board is further satisfied that the RO has substantially complied with its May 2015 remand directives. Stegall v. West, 11 Vet. App. 268, 271 (1998); see also D'Aries v. Peake, 22 Vet. App. 97, 105 (2008) (finding that only substantial compliance, rather than strict compliance, with the terms of a Board engagement letter requesting a medical opinion is required). The RO issued an SOC on the claims for hearing loss and tinnitus, invited the Veteran to identify or submit additional evidence, afforded a VA examination responsive to the Board's inquiries, and granted a temporary total evaluation under 38 C.F.R. § 4.30. 

The RO did not refer the claim for a TDIU to the Director, Compensation Service, for consideration of an extraschedular TDIU from August 20, 2003 to November 2003. However, as a temporary 100 percent rating was awarded for the right knee disability from August 20, 2003 to November 1, 2003, the matter of a TDIU for this time period is moot. See Herlehy v. Principi, 15 Vet. App. 33 (2001). As the Veteran did not have other service-connected disabilities rated at 60 percent or more for this time period, the concerns of Bradley v. Peake, 22 Vet. App. 280 (2008) are not raised.
 
Additionally, the claim for a TDIU was not included in the most recent supplemental statement of the case (SSOC), however, as it was readjudicated by the RO in May 2016 deferred and standard rating decisions, remand is not necessary. D'Aries, 22 Vet. App. at 105.

In sum, the Veteran has been afforded a meaningful opportunity to participate in the development of his appeal. He has not identified any outstanding evidence which could support his claims, and there is no evidence of any VA error in notifying or assisting the Veteran that could result in prejudice to him or that could otherwise affect the essential fairness of the adjudication. 



ORDER

An initial rating in excess of 10 percent for patella chondromalacia of the right knee prior to December 28, 2009 is denied. 

A rating in excess of 30 percent for patella chondromalacia of the right knee since December 28, 2009 is denied. 

An initial compensable rating for bilateral hearing loss is denied. 

An initial rating in excess of 10 percent for tinnitus is denied.

An extension of a temporary total rating following right knee surgery beyond November 1, 2003, under the provisions of 38 C.F.R. § 4.30, is denied.

A TDIU is denied. 




____________________________________________
M. TENNER
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs